**CITIZENS SAVINGS BANK, HAWKEYE, IOWA, Appellant,**

v.

**Dale D. MILLER, Arlene Miller, and James Miller, Defendants,**

and

**The First National Bank of Sumner, Appellee.**

**No. 93–451.**

Supreme Court of Iowa.

April 20, 1994.

James S. Updegraff, West Union, for appellant.

David M. Engelbrecht of Engelbrecht, Ackerman & Hassman, Waverly, for appellee.

Considered by CARTER, P.J., and NEUMAN, SNELL, ANDREASEN, and TERNUS, JJ.

NEUMAN, Justice.

This dispute focuses on conflicting rights of secured creditors who each claim priority in fifteen head of cattle owned by defendants Dale and Arlene Miller. Plaintiff Citizens Savings Bank of Hawkeye, Iowa ("Hawkeye") asserts priority based on a purchase money security interest ("PMSI"). Defendant First National Bank of Sumner, Iowa ("Sumner") contests the validity of Hawkeye's PMSI and rests its claim on prior perfection of its security interest. The district court, ruling on cross-motions for summary judgment, held that Hawkeye's inability to identify the proceeds of its PMSI extinguished its priority status. We affirm.

Because this case reaches us on appeal from summary judgment, our task is to determine, first, whether a genuine issue of material fact exists and, second, whether the district court applied the law correctly. *First Nat'l Bank v. Lamoni Livestock Sales,* 417 N.W.2d 443, 445 (Iowa 1987).

The relevant facts are undisputed. Since February 1982, Sumner has financed Dale and Arlene Miller's farming operation. It has continuously held a perfected security interest in their livestock and agricultural equipment.

In January 1983, the Millers' son, James, started his own dairy operation with another partner. He borrowed $25,000 from Hawkeye, most of which was used to purchase a one-half interest in forty-seven dairy cows. The parties agree that the security agreement and financing statement filed in connection with this transaction gave Hawkeye a purchase money security interest in these cattle.

James' dairy venture quickly soured. Hawkeye loan officers met with James and Dale in May 1983 to work out a refinancing plan. The dairy partnership was terminated and fifteen of the cows were incorporated into Dale's herd. Dale agreed to satisfy James' debt to Hawkeye by executing a new note in the sum of $26,714.02. This new debt was secured by a new security agreement and financing statement delivered by Dale to Hawkeye in August 1983.

The documents executed by Dale gave Hawkeye a blanket security interest in "[a]ll farm equipment, all farm products including livestock, all feed and supplies used in farming operations, and additions and replacements of accessions, parts and equipment...." Subsequent continuation security agreements given in June and July 1987 refer specifically to "15 dairy cows assumed from James Miller in the fall of 1983 and any changes or replacements thereof."

By September 1992, the Millers' debts to both Hawkeye and Sumner were in default. The unpaid balance of Dale's secured debt to Hawkeye totaled $10,337.07. Dale and Arlene's secured debt to Sumner totaled $128,801.29. Following judgment for the banks on each debt, the question of relative priority in the collateral arose.

Iowa Code section 554.9312 (1991) governs the priority of security interests in the same collateral. Under section 554.9312(5)(a), "conflicting security interests rank according to priority in time of filing or perfection." It is undisputed that, absent Hawkeye's claim of a purchase money security interest in fifteen of the Millers' cattle, Sumner's security interest in all the livestock would be entitled to priority under this section. Hawkeye argues, however, that section 554.9312(4) governs the conflict. That section reads:

> A purchase money security interest in collateral other than inventory has priority over a conflicting security interest in the same collateral or its proceeds....

Iowa Code § 554.9312(4). By definition a security interest qualifies as a PMSI when it is

> taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used.

Iowa Code § 554.9107(b); *see Farmers Coop. Elev. Co. v. Union State Bank*, 409 N.W.2d 178, 180 (Iowa 1987) (describing PMSI as simply "a secured loan for the price of new collateral").

■ In view of the fact that James' debt for the cattle purchase was extinguished upon Dale's execution of a new note and mortgage, we question whether the *priority* of Hawkeye's security interest in the cattle "traveled" with the herd. *See* Iowa Code Ann. § 554.9107, cmt. 2 (West Supp.1994) (where secured party is not the seller, statutory term "making advances or incurring an obligation" connotes present consideration and "excludes from the purchase money category any security interest taken as security for or in satisfaction of a pre-existing claim or antecedent debt"). The district court, however, did not rest its decision on this ground. Rather, it held that no genuine issue existed regarding the fact that the cattle comprising the Millers' herd in 1992 were not those acquired from James in 1983, nor were they "proceeds" of the cattle in which Hawkeye once held a PMSI. We agree that this is a sufficient basis upon which to grant Sumner judgment as a matter of law.

■ The term "proceeds" is defined in the Uniform Commercial Code as "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds." Iowa Code § 554.9306(1); *Humboldt Trust & Sav. Bank v. Entler*, 349 N.W.2d 778, 782–83 (Iowa 1984). Hawkeye would have this court expand the definition to the full extent of its blanket security interest in the herd's "issue ... additions, replacements, and substitutions." To do so would be incorrect, however, because Hawkeye's secured position and its priority status are not coextensive. Just as this court held in *Farmers Co-op* that hogs are not the "proceeds" of the feed they consume, neither are calves the "proceeds" of cattle that give birth to them. Hawkeye took a purchase money security interest to secure the price of the cattle, not their issue. *See Farmers Co-op*, 409 N.W.2d at 180.

■ Replacement cattle, on the other hand, could meet the statutory definition of proceeds if received upon "other disposition of" the original cattle. *See Humboldt*, 349 N.W.2d at 783 (bank's security interest continued in traded vehicles directly traceable to sale of collateral). To successfully claim PMSI priority on this ground, however, the proceeds must be identifiable. Iowa Code § 554.9306(2); *Domain Indus., Inc. v. First Sec. Bank & Trust Co.*, 230 N.W.2d 165, 168 (Iowa 1975). This would require proof that fifteen cattle currently in the Millers' herd are traceable to those originally encumbered by Hawkeye's lien. *Humboldt*, 349 N.W.2d at 783. Given the passage of time, Hawkeye concedes its inability to make that identification.

Under this factual record, the district court properly granted Sumner judgment as a matter of law. Hawkeye's inability to identify the proceeds of collateral once securing its indebtedness has defeated its claim of PMSI priority.

**AFFIRMED.**